Nott, Ch. J.,
delivered the opinion of the court:
These mail-messenger contracts, in substantially identical language, have been again and again before the court during the last eighteen years. Their provisions have been construed, and both parties, though the amounts involved were large, have remained content with the decisions of the court; that is to say, no case has been appealed. It must, therefore, be regarded as the settled rule of decision of this court that the “ new or additional mail-messenger or transfer service ” which is to be performed “ without additional compensation ” is one thing, and that service which is different in kind and character is another; and that for the former the contractor can not recover, but for the latter he may.
The present case is peculiar and unlike those which have gone before it in this: That the services constituting the principal cause of action were in form “ new or additional,” but in substance a radical and extraordinary departure from the reasonable obligations of the contract. The very magnitude of the service exacted by the Post-Office Department changed the service in kind and character. In form it was “ new or additional;” in substance it was rendered for a new and different system of postal administration in the city of New York of such magnitude that it could not have been anticipated or foreseen by the most prudent and experienced business man who proposed to bid for the service or enter into the contract. It was service different in kind and character, because it was incidental and consequent to the introduction of a condition into the city postal service which had never been there before — the establishment of a new post-office system.
The magnitude of the change is conclusively shown by the leading facts in this case:
In 1892 the postal business in the city of New York had so outgrown the capacity of the general post-office that it was seriously congested, and an enlargement of that building, directly or indirectly, was imperatively and immediately required. To meet this postal exigency, Congress authorized the renting of a building “to be used for general post-office business in said city.'''1 (Act 3d March, 1893, 27 Stat. L., *436 732.) The Department thereupon rented a large building at Forty-fourth street and Lexington avenue, known as the “ Industrial Building,” 3-J- miles distant from the general post-office. The city may then be considered as having been divided by a line running through Fourteenth street, and all of the postal business south of that line was retained in the general post-office, and nearly all of the business north of that line was transferred to the new building, popularly known as the “ Industrial Building branch,” officially designated as “ Station FI.” There was thus established, in effect, two general post-offices and two general postal systems where there had been only one before.
The duplication of systems is more clearly illustrated by the duplication of services which accompanied it.
When the claimant entered into the performance of the contract there was handed to its officers a printed book, entitled “ Post-office, New York, N. Y., Transportation Schedule.” The arrivals and departures and hours and places therein set forth indicated the service to be performed. When the new general post-office was established in the Industrial Building there was handed to the claimant another copy of the same printed book, showing the same railway stations and trips, and, with some modifications, the same hours at which trips were to be performed. On the title of this copy of the book was pasted a slip saying “ Industrial Building branch.” In other words, as the requirement was duplicated, so the contractor’s services were substantially doubled. Where it had been required to send out one wagon at a certain hour to make one trip from one place to a railroad depot, it was required to send out two wagons for the same train at substantially the same hour from two places. That is to say, where one wagonload of mail matter went from the general post-office to the Pennsylvania Bailroad depot in Jersey City, two wagons now had to go, the one from the general post-office and the other from the Industrial Building ; and, conversely, when the mail arrived at the Pennsylvania de23ot two wagons had to meet it, the one to carry half of it to the old general post-office and the other to carry the remainder of it to the new general post-office.
*437 Again, there was a post-office station known as “ Station O ” (which had been a subject of litigation in this court, Woolverton's Case, 34 C. Cls. R., 247), used chiefly for the bulky second-class printed matter of publishers, and such matter was received chiefly at Station O. After the establishment of the new post-office in the Industrial Building this Station O, so far as it related to second-class matter, was abandoned, and such matter was received only at the Industrial Buiding. So far it would seem that here was but the substitution of one place for another — that Station O was merely moved from Thirteenth street and Fifth avenue to Forty-fourth street and Lexington avenue. But it appears that the number of trips previously made from Station O daily was 17 and on Sunday 4, while the number of trips made from the Industrial Building was 266 daily and 70 on Sunday. That is to say, “ all first-class matter (letters) previously collected in the district of Station H continued to be reeceived and handled there; massed matter made up by States for the East, North, and West, which had previously been sent to the general post-office for distribution was sent to the Industrial branch to be distributed; the South and West mail was taken there during the period in suit and assorted, and all of the second-class bulky matter of publishers above Fourteenth street, which had previously been received at Station O, was received at the Industrial Building; also third and fourth class matter mailed in uptown stations, which had previoussly come to the general post-office, was sent to the Industrial Building, thereby relieving the general post-office from handling.that matter.”
It is probable that the duplication of wagon trips did not literally double the contractor’s expenses. When the mail matter was divided between the two general post-offices the quantity sent to and from the old general post-office was diminished. The wagon which was previously drawn by two horses may have been drawn by one; where three loads had come or gone at a certain hour from or to a certain place, the mass of that “ dispatch,” as it is called, may have been reduced to two loads. But, nevertheless, it appears that the duplicate service which was exacted from the contractor instantly required more than 80 additional horses, moré than *438 32 additional wagons, from 33 to 50 additional men, and involved an additional mileage service, estimated by the claimant’s witnesses at 463,000 miles per annum, and conceded by the defendants to be at least 311,939.47. The increased cost to be borne by the contractor is also significantly shown by the fact that the increased expense for the ferriage of wagons which had to cross the North and East rivers in the delivery of mails to the raih'oads was $9,950.22.
The term “ dispatch ” is a technical one in the postal service, and means a mass of matter to be sent to a certain place at a certain time. The term “ trip ” is also technical, and refers to the wagon which will carry the whole or a part of the dispatch.
In previous cases relating to these mail-messenger contracts the court has always been guided by a general principle. -The contract has been considered, like all contracts, as having a definite subject-matter, known to both parties, concerning which they were contracting, but subject to two future unknown fluctuations, in the volume of the business and the amount of the service to be rendered. These fluctuations would be, the one always and the other frequently, adverse to the contractor. The first would be the inevitable growth of the postal business during the ensuing four-year period of the contract; the second, the increased internal machinery of the existing system, such as new stations, more frequent dispatches, etc., consequent to the increased volume of postal business, or necessary, in the judgment of the Department, to remedy defects in the existing system and make it more effective for the public'convenience. Accordingly, it has also been held that the Department might multiply the number of branch post-offices and stations and increase the wagon trips to and from the railroads and between the general post-office and the branch post-óffices and stations, but could not bring into the contract a new subject-matter and compel the contractor to render without compensation a service which he had not contracted to perform.
Thus, where the contractor had agreed to carry the mails from the general post-office in New York to the railroads in Jersey City, the court held that he could not be required to *439 carry them to the Jersey City post-office; and where he had agreed to carry them between the general post-office and the branch post-offices and stations in the city, that he could not be required to carry them to numerous newly devised substations of a different character scattered about the city in apothecaries and cigar shops. In a word, the subject-matter of the contract was held to be the administrative system of the postal service in the city as it existed when the contract was made, with such additions or abbreviations as might be expressly set forth in the contract.
In the present case the bricks and mortar of the changed administrative system are the same — there are the same post-office stations and railroads and steamboats — but out of identical materials an entirely new edifice has been built. In the details there has been no change, but in the aggregate of changes there has been an entire reconstruction of the system; and the new subject of contract brought thereby into the field of operation is far greater than in any case that has heretofore been brought before the court. The court is therefore of the opinion that for this service so rendered the claimant is entitled to recover what the service was reasonably worth. To hold otherwise would be to hold that this carefully prepared contract, with the elaborate specifications thereto annexed, might be reduced to three lines: The undersigned, in consideration of $-, covenants and agrees that during the next four years he will do whatever the Post-Office Department bids him.
There is a second cause of action, founded upon misinformation given to the contractor when the bid was made and the contract executed.
The advertisement for proposals represented that there were two stations on an elevated street railroad in the city which were each served, going and coming, by 62 trips of daily mail-messenger service. In fact, there were just double that number' of stations, and the business existing required just double the alleged number of trips. In the case of Burgwyn (34 C. Cls. R., 848), which was relied upon by the defendants, the decision rested upon the fact that the information which the contractor needed (the soundings of *440 a channel which he was to dredge) was equally within the reach of both parties. In this case the information ivas peculiarly within the possession of the defendants. They knew, and were supposed to know, and must have known, to how many of these elevated-railroad stations the mails were then carried. True it is that the advertisement declared that the bidders must inform themselves, and that no aditional compensation would be allowed for mistakes, and that they must seek the postmaster for explanations. But here was an instance where the bidder might inform himself by reading with care the statement which the Department placed in his hands; and it was not a case which required the bidder to seek the postmaster for explanations, for nothing could be plainer than that which was stated; and it was not a case of mistake, for the matter was understood precisely as it was written. A trivial error, such as saying that there were 30 stations when in fact there were 31, might be called a mistake; but here there was no trivial error, but a plain misrepresentation of 100 per cent.
The purpose of the advertisement was to attract bidders and invite competition; and ivhen the Department, to invite competition, volunteered to give bidders specific information of .existing conditions within its own knowledge, and not within the knowledge of the bidders, it was bound to give them information upon which they could rely. For the court to hold that such information so volunteered might be worthless and, as in this case, delusive, would be to warn all prudent-persons out of the .competitve market and thereby destroy effective competition. The court is of the opinion that the representation made by the Department in this matter of these elevated-railroad stations must be deemed in the nature of a warranty.
There is a third cause of action, namely, that the contractor was compelled to carry the mails from the wagons up the stairs of the elevated roads and deliver them to the mail agents on the trains. It is contended that the service contracted for was wagon service, while this was foot service. The court nevertheless is of the opinion that the provision of 'the contract “ to take the mail from and deliver it into the *441 post-offices, mail stations, and cars ” did not authorize the contractor to deliver the mails in the streets below the elevated roads and outside of the railroad stations, but cast upon him -the burden of conveying them from the streets and of delivering them “ into ” the stations.
The judgment of the court is that the claimant recover for the service rendered in connection with the Industrial Building Branch of the postal service $68,483, and for the duplication of service to the Manhattan Railroad stations, $14,538, amounting in the aggregate to $83,021.